# United States Tax Court

T.C. Memo. 2024-34

SUNIL S. PATEL AND LAURIE MCANALLY PATEL, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 24344-17, 11352-18,        Filed March 26, 2024.
     25268-18.

————

Ps claimed deductions under I.R.C. § 162 on their 2013, 2014, 2015, and 2016 tax returns for amounts paid to purported captive insurance companies A and B and to entity C, which purported to reinsure a portion of its risk with A and B. R denied the deductions and determined that A's and B's elections under I.R.C. § 831(b) were invalid, because the amounts paid did not qualify as insurance premiums for federal income tax purposes.

*Held*: Amounts paid to A and B are not insurance premiums for federal income tax purposes and are not deductible under I.R.C. § 162.

————

*David D. Aughtry* and *Patrick J. McCann, Jr.*, for petitioners.

*Sebastian Voth* and *Emerald G. Smith*, for respondent.

————

[1] Cases of the following petitioners have been consolidated herewith for purposes of trial, briefing, and disposition: Sunil S. Patel and Laurie M. McAnally-Patel, Docket Nos. 11352-18 and 25268-18.

**[\*2]**     MEMORANDUM FINDINGS OF FACT AND OPINION

JONES, *Judge*: Sunil S. Patel, M.D. (Dr. Patel) and Laurie M. McAnally-Patel, M.D. (Dr. McAnally-Patel)[2] seek redetermination of deficiencies in federal income tax determined by the Internal Revenue Service (IRS) for taxable years 2013, 2014, 2015, and 2016 (tax years at issue).

Dr. Patel is the co-founder of an eye surgery center and the founder of two research centers in the West Texas area. Beginning in 2011, Dr. Patel's businesses supplemented their commercial insurance coverage by purchasing assorted policies from purported microcaptive[3] insurance companies—Magellan Insurance Company (Magellan) and Plymouth Insurance Company (Plymouth)—that Dr. Patel also controlled. The premiums paid to the microcaptives were substantially more than the premiums paid to Dr. Patel's commercial insurers, creating substantial tax benefits for the Patels.

The IRS examined the purported insurance arrangements for each of the tax years at issue and concluded that the purported insurance premiums paid to Magellan and Plymouth could not be treated or taxed under section 831(b).[4] Thus, it issued notices of

---

[2] We sometimes refer to Dr. Patel and Dr. McAnally-Patel as the Patels.

[3] "A 'captive insurance company' is a corporation whose stock is owned by one or a small number of companies and which handles all or a part of the insurance needs of its shareholders or their affiliates." *Caylor Land & Dev., Inc. v. Commissioner*, T.C. Memo. 2021-30, at \*8 n.4; *see also Harper Grp. v. Commissioner*, 96 T.C. 45, 46 n.3 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992). In our prior cases, we have adopted the term "microcaptive" to refer to "a small captive insurance company," i.e., one that takes in less than $1.2 or $2.2 million (adjusted for inflation) in premiums depending on the tax year at issue. *See Caylor Land & Dev.*, T.C. Memo. 2021-30, at \*8 n.4; *see also Avrahami v. Commissioner*, 149 T.C. 144, 179 (2017); *Swift v. Commissioner*, T.C. Memo. 2024-13, at \*2 n.1; *Keating v. Commissioner*, T.C. Memo. 2024-2, at \*50 n.52 (explaining that amendments to section 831(b) increased the premium ceiling). The Patels take issue with the term "microcaptive," apparently viewing the word as "diminutive" and asserting that "some [Court] opinions reflect that subtle, insidious, inaccurate prejudice." *See* Docket No. 24344-17, Pet'rs' Reply Br. at 52 (Doc. 354). We disagree. We do not view the word "microcaptive" as pejorative and will continue to use the term consistent with our prior cases.

[4] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulatory references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

**[\*3]** deficiency that disallowed the claimed deductions and determined accuracy-related penalties.[5]

The issue for decision is whether the transactions involving Magellan and Plymouth constituted insurance for federal income tax purposes pursuant to section 831(b).

For the reasons set forth herein, we will sustain the Commissioner's determinations that the transactions at issue did not constitute insurance for federal income tax purposes.

## FINDINGS OF FACT

This case was tried during a special trial session in Washington, D.C. The parties filed three stipulations of fact with accompanying exhibits. We incorporate by this reference the stipulations of settled issues and facts, the stipulated exhibits, and any exhibits admitted at trial, except to the extent set forth herein.

The parties also filed a Fourth Stipulation of Facts (Fourth Stipulation) and accompanying exhibits, subject to respondent's objections. After receiving the parties' arguments at trial, the Court took the Fourth Stipulation under advisement and allowed the parties to make additional arguments in posttrial briefing. Having now considered the parties' arguments, the Court overrules respondent's objections and receives the Fourth Stipulation and accompanying exhibits into evidence.

In our Findings of Fact, we use the terms "insurance," "reinsurance," "risk," "pooling," "coverage," "policy," and similar terms to describe the forms of the transactions at issue in these cases. But our use of those terms does not reflect any ruling as a matter of fact or law with respect to insurance or insurance companies within the meaning of the Code. *See Rsrv. Mech. Corp. v. Commissioner*, T.C. Memo. 2018-86, at \*3, *aff'd*, 34 F.4th 881 (10th Cir. 2022).

The Patels resided in Texas when they timely petitioned this Court.

---

[5] We will address the IRS's penalty determinations in a separate opinion.

**[*4]** I.    *The Patels and Their Businesses*

    A.    *Dr. Patel's Early Life and Education*

Dr. Patel was born in India and immigrated to the United States as a child. Although he did not speak English when he started school at the age of nine, he ultimately graduated from high school in the top five percent of his class. He earned a bachelor of science degree in physics from the University of California, Los Angeles in 1983. In 1989, he earned a doctor of philosophy degree in immunology, and in 1991 he earned a doctor of medicine degree, both from the University of Texas Southwest. After completing a residency and fellowships in California, Dr. Patel returned to Texas in 1997 to practice medicine.

    B.    *Dr. McAnally-Patel's Education and Career*

During his quest for higher education, Dr. Patel met Dr. McAnally-Patel;[6] they married in 1989. Dr. McAnally-Patel also completed medical school and was licensed to practice medicine in Texas from November 22, 1997, until May 5, 2015. However, she no longer maintains an active medical license.

In 2009, Dr. McAnally-Patel obtained a certificate to teach high school science. She now teaches physics at a high school in Abilene, Texas.

    C.    *Ophthalmology Specialists of Texas, Integrated Clinical Research, and Strategic Clinical Research Group*

In August 2000, Dr. Patel formed his own eye surgery practice, Ophthalmology Specialists of Texas[7] (OST) doing business as West Texas Retina Consultants. OST specializes in the evaluation and management of eye-related medical conditions involving the retina, vitreous, and macula. Providers at OST operate on eyeballs, including conducting pneumatic retinopexy, retina laser surgery, biopsies of ocular infections, and intraocular injections.

---

[6] The record does not reflect that Dr. McAnally-Patel had any involvement in the purported microcaptive transactions. Nonetheless, our decisions today will affect her joint federal income tax returns. *See infra* Opinion Part IV.

[7] OST was initially formed as a Texas professional association in August 2000, but it was converted to a Texas professional limited liability company in November 2011.

**[\*5]**  In addition to his work with OST, Dr. Patel conducts clinical research trials on experimental drugs for retina diseases through two companies he established: Integrated Clinical Research, LLC (ICR) and Strategic Clinical Research Group, LLC (SCR). OST refers 98 percent of the ICR and SCR patients.

The same type of work is performed at ICR and SCR, but at different locations. That is, they enter into contracts and clinical trial protocols with pharmaceutical companies to test experimental drugs. Human volunteers are tested to determine whether the drugs are safe. The two companies also enter into agreements with the U.S. Food and Drug Administration (FDA). The pharmaceutical companies may use the data to obtain FDA approval of the drugs.

During the tax years at issue, the balance of OST, ICR, and SCR procedures consisted of conducting surgeries and laser procedures as well as inserting injections into eyeballs. Procedures involve a range of potential patient risks, including pain, infection, inflammation, bleeding, loss of vision, loss of an eyeball, and death.

All three entities face regulatory oversight from federal and state authorities. Dr. Patel views this regulatory oversight as a "massive burden." He also believes that, as a retina specialist, he has a target placed on his back by the government. During the tax years at issue, the three entities had between seven and eight offices, five doctors, and fewer than 100 employees. Several of the employees and physicians overlap among the three entities. Further, the ICR and OST offices are located at the same address.

II.  *The Patels' Lawsuits and Introduction to Captive Insurance*

In 2002, Dr. McAnally-Patel was sued by a patient for care she provided at a regional hospital's clinic for indigent patients. As a result, in approximately 2003, the Patels consulted with an attorney to discuss asset protection, including captive insurance. They ultimately opted not to form a captive insurance company after the meeting. Instead, they opted to form two separate family partnerships for asset protection.

In 2003, Dr. Patel and other physicians decided to form a hospital, in part so that Dr. Patel would not have to wait for operating rooms for his patients. Dr. Patel's family, friends, and fellow physicians invested with him to form the new hospital. In connection with this endeavor, Dr.

[*6] Patel formed two separate entities: (1) West Texas Hospital, Ltd.[8] (West Texas Hospital), to operate the new hospital; and (2) Hospital Properties Management, LLP (Hospital Properties), to build and own the hospital. In February 2004, Hospital Properties purchased land across the street from OST and then built a hospital.

In 2005, West Texas Hospital opened as a 14-bed surgical hospital in Abilene, Texas. Less than two years later, in January 2007, a patient at West Texas Hospital suffered complications following spinal surgery performed by a different doctor. The patient was transferred to another hospital and ultimately died.

After the death, West Texas Hospital received negative publicity. As a result, politicians and regulatory agencies began investigating West Texas Hospital. Ultimately, just over two months after the patient's death, West Texas Hospital lost its Medicare provider contract, thus losing 60 to 70 percent of its total revenue.

West Texas Hospital ceased operations after its Medicare contract was officially terminated. Drs. Patel and McAnally-Patel, along with West Texas Hospital and others affiliated with West Texas Hospital, were sued by the estate of the deceased patient. That case continued through September 28, 2015.

West Texas Hospital was not profitable during the time it operated. Between personal money and personally guaranteed debt, Dr. Patel and his family invested $3.1 million to open and fund West Texas Hospital. Approximately two-thirds of the Patels' total loss was related to the commercial real estate purchased by Hospital Properties, and one-third was related to West Texas Hospital. The commercial real estate owned by Hospital Properties faced foreclosure in February 2008.

III.  *Formation of the Captives*

A.  *Introduction to Christopher Fay and CIC Services*

In May 2007, just a few months after the death of the West Texas Hospital patient, Dr. Patel purchased a book about asset protection, which included a chapter on captive insurance. At that time, Dr. Patel considered forming a captive, but he ultimately did not do so. Four years later, in May 2011, Dr. Patel purchased another copy of the same asset

---

[8] Initially, Dr. Patel formed West Texas Specialty Hospital, Ltd., on March 26, 2003, but he changed the name to West Texas Hospital, Ltd., on July 18, 2003.

**[*7]** protection book he had purchased in 2007. In addition, he purchased two books on captive insurance.[9]

Around that same time, in approximately May 2011, Dr. Patel's business partner, Dr. Young Lee, introduced Dr. Patel to a financial planner, Christopher Fay, to discuss financial and insurance products. During Dr. Patel's introductory call with Mr. Fay, Dr. Patel expressed his interest in forming a captive insurance company. Dr. Patel already knew he wanted to form a captive when he called Mr. Fay. The purpose of his call with Mr. Fay was to identify someone to help him form a captive, not to advise him about whether a captive was the right decision.

Mr. Fay did not know much about captive insurance, so he recommended that Dr. Patel meet with Sean King[10] of CIC Services, LLC (CIC Services) to discuss forming a captive. In an email sent to facilitate a meeting between Dr. Patel and Mr. Sean King, Mr. Fay stated that Dr. Patel was the "MD paying almost 2.5M in income taxes and did his own research on [captive insurance companies]. He wants to talk with Sean about doing potentially 2 CIC[s]."

In addition to introducing Dr. Patel to Mr. Sean King, Mr. Fay asked Dr. Patel to complete a feasibility study. According to Dr. Patel, Mr. Fay emailed the feasibility study several times. At trial, Dr. Patel disclaimed any interest in financial products offered by Mr. Fay. According to Dr. Patel, he is a "savvy financial person" and he did not want any advice. Rather, he knew that he wanted to form a captive insurance company.

Eventually, Dr. Patel completed the feasibility study, although the exact timing of when he completed it is a matter of dispute and not entirely clear. At trial, Dr. Patel stated that he completed the study in

---

[9] The names of the books are (1) *Asset Protection: Concepts and Strategies for Protecting Your Wealth* by Jay Adkisson and Chris Riser; (2) *Taken Captive: The Secret to Capturing Your Piece of America's Multi-Billion Dollar Insurance Industry* by R. Wesley Sierk, III; and (3) *Adkisson's Captive Insurance Companies: An Introduction to Captives, Closely-Held Insurance Companies, and Risk Retention Groups* by Jay Adkisson.

[10] Thomas King of CIC Services is Sean King's father. Because both individuals are discussed throughout this Opinion, we refer to them as Mr. Sean King and Mr. Thomas King for clarity.

**[\*8]** 2012 out of an apparent sense of obligation and "politeness" because he would be working with Mr. Fay on and off.

However, at his deposition, Dr. Patel gave conflicting answers, stating that he completed the feasibility study in 2011 because "we were looking at possibly starting a captive insurance company" and later, after several breaks and through questions posed by his own attorney, changing his answer and stating that the feasibility study related to financial services and not forming a captive. In any event, the feasibility study he completed focused exclusively on wealth and estate planning. It did not mention or discuss captive insurance. On the form, Dr. Patel stated that his goals were aggressive growth and wealth accumulation.

In June 2011, Dr. Patel met with Mr. Sean King and Mr. Fay to discuss forming a captive insurance company. At this juncture, Dr. Patel had already determined that he wanted to form one. He was not seeking advice about whether to form a captive. Rather, he was seeking advice about structuring the captive and how to move forward.

Mr. Sean King advised that CIC Services could handle management responsibilities for a captive insurance company. However, he recommended attorneys Dr. Patel could contact to form a captive. Although Mr. Sean King recommended several attorneys, he "really liked" James Coomes.

In July 2011, without conducting any studies related to the need to form a captive, Dr. Patel emailed Mr. Fay and stated that he wanted to move forward with forming two captive insurance companies. In response, Mr. Sean King suggested that they schedule a phone call that included Mr. Coomes.

B.    *James Coomes and Capstone Reinsurance Co.*

1.    *Background*

Mr. Coomes has been an attorney since 1999. After obtaining a master of laws degree in taxation at New York University, Mr. Coomes joined a law firm where he spent roughly half of his practice focusing on estate planning. Mr. Coomes also taught estate planning at the University of Alabama Law School from approximately 2005 through 2011.

In 2011, Mr. Coomes formed his own practice, specializing in captive insurance companies, business corporate work, and estate

[*9] planning. In connection with his work representing captive insurance companies, Mr. Coomes drafted insurance policies. Mr. Coomes does not have formal training in captive insurance or writing insurance policies. Rather, he learned to write insurance policies by reviewing commercial insurance policies, reading articles, and studying books.

### 2. *Formation of Capstone Reinsurance Company, Ltd.*

In November 2012, Mr. Coomes formed Capstone Reinsurance Company, Ltd. (Capstone), in the Turks and Caicos Islands. Capstone operates as a reinsurance company, purportedly providing risk sharing among captive insurance companies. Mr. Coomes and his wife served as the officers and directors of Capstone during the tax years at issue. Mr. Coomes served as the president, and Capstone had no other employees. The details of the Capstone reinsurance program are discussed more fully *infra* Findings of Fact Part III.F.

Beginning in 2014, Jennifer Stalvey of the Tennessee Department of Commerce & Insurance (TDCI) examined Capstone as a reinsurance pool. Based on its examination, TDCI approved Capstone Reinsurance as a risk-distribution reinsurance pool for Tennessee captive insurance companies. Similarly, TDCI approved CIC Services as a Tennessee Captive Manager.

### C. *Magellan Insurance Co.*

### 1. *Formation of Magellan*

In August 2011, Mr. Sean King and Mr. Coomes held a telephone conference with Dr. Patel to discuss forming a captive. Ultimately, Dr. Patel retained Mr. Coomes to handle the formation and operation of a captive insurance program.

After engaging Mr. Coomes, Dr. Patel and his assistant, Lindsay Guerrero, completed applications for captive insurance for OST and ICR in November 2011. The applications included requests for information regarding the size and nature of the business operations, the number of business locations, the number of employees, their key customers and suppliers, the coverages provided by their commercial carriers, and their commercial loss history.

After receiving the applications, Mr. Coomes forwarded them to an actuary, Allen Rosenbach of ACR Solutions Group, to price the

[*10] premiums for the policies. On one occasion, Mr. Coomes and Mr. Rosenbach interviewed Dr. Patel about the applications. Mr. Coomes and Mr. Rosenbach identified coverages for the insureds, including OST and ICR.

Further, Mr. Coomes created a Business Plan for the proposed insurance company, Magellan, outlining proposed insurance coverages through the captive. The Business Plan set forth the business rationale for forming the captive:

> (i) obtaining the ability to insure risks which are otherwise unavailable in the traditional commercial marketplace and to design custom insurance policies, (ii) retaining profits that would otherwise have to be paid to commercial insurers in the form of premiums in excess of the amounts repaid to cover losses, (iii) achieving flexibility in choosing investments into which the premiums of [Magellan] may be made, and (iv) obtaining access to the re-insurance market if desired.

Pursuant to the Business Plan, Magellan intended to participate in a risk pool "with other captive insurance companies" that "cover[s] business risks relating to terrorist attacks." In the first year, premiums charged were expected to be in the range of $1,145,000. Further, the Business Plan called for Magellan to file an election under section 953(d) to enable it to be taxed as an insurance company in the United States. The Business Plan also noted that "[i]t is also intended that [Magellan] will limit its insurance activity to levels where its premiums are not in excess of US $1,200,000 per annum."

Through Mr. Coomes, and consistent with the Business Plan, Dr. Patel submitted an application for Magellan to carry on as an insurance business with the Federation of St. Christopher and Nevis (St. Kitts) Financial Services Regulatory Commission (FSRC) on November 22, 2011. Magellan was incorporated in St. Kitts on December 8, 2011. Additionally, that same day, Magellan filed its Memorandum and Articles of Association with the FSRC, indicating that Magellan would be engaged in "Group Captive Insurance, primarily, property and casualty insurance." Further, the Statutory Statement identified Corporate Solutions, Ltd. and Heritor Management, Ltd. as Directors of Magellan. Magellan's application to carry on an insurance business was approved, and on December 22, 2011, Magellan received its insurance license from St. Kitts FSRC.

**[\*11]** Although Mr. Coomes completed the Business Plan, neither he nor anyone associated with Magellan completed a feasibility study to determine the costs and merits of a captive arrangement for Dr. Patel's businesses. Respondent's expert, Roberta Garland, explained that a feasibility study "is an important aspect of setting up a captive" and a proper feasibility study would explore the various alternatives and perform a cost-benefit analysis of a captive before moving forward. Moreover, neither Dr. Patel nor his advisers explored the cost and availability of the same policies on the commercial market. The feasibility study completed by Dr. Patel, at the request of Mr. Fay, did not discuss captive insurance.

2.     *Ownership of Magellan and Investment of Assets*

Magellan is owned by Odyssey Properties, LLC (Odyssey), a limited liability company formed under the laws of Wyoming on November 9, 2011. Initially, Odyssey was owned by Dr. Patel (35 percent), Dr. McAnally-Patel (35 percent), and the Patel Business Trust (30 percent).

Magellan's substantial premiums, coupled with modest expenses and claims history, meant that it had significant resources on hand. In January 2012, Dr. Patel met with Mr. Sean King and Mr. Fay to discuss investment of Magellan's assets. On January 16, 2012, Dr. Patel signed an application for a separate legal entity that had yet to be created, Magellan Investments, LLC (Magellan Investments), to acquire an "Eclipse Indexed Life" insurance plan. Ten days later, on January 26, 2012, Mr. Coomes filed articles of organization for Magellan Investments, as a single-member limited liability company under the laws of Wyoming. Magellan Investments is wholly owned by Magellan.

In April 2012, Magellan Investments completed the purchase of a life insurance policy from Minnesota Life Insurance Company (Minnesota Life), insuring the life of Dr. Patel, with planned annual premiums of $1,150,000 and a death benefit of $43,348,241. The Minnesota Life policy is Magellan Investments' primary asset.

In 2016, the Patels transferred another thirty percent interest to the Patel Business Trust. Thus, the Patels now each have a 20 percent interest in Magellan through Odyssey. The Patel Business Trust now owns 60 percent of Magellan through Odyssey. The Patel Business Trust names the Patels' three children as beneficiaries, meaning the Patels' children own 60 percent of Magellan. The Patels decided to make this

[*12] change, in part, because of the increasing value of their businesses. In August 2016, Mr. Fay sent an email to Mr. Coomes, inquiring whether, now that Magellan was owned by a 60 percent trust for the Patels' children, "we assume that 60% of death proceeds are out of Patel's estate and not subject to taxes?" Mr. Coomes responded: "That is a reasonable assumption."

### D. *Plymouth Insurance Co.*

In February 2016, Dr. Patel informed Mr. Fay that he wanted to form a new captive. Dr. Patel claims that he decided to form the second captive because of statutory changes enacted in 2015 that changed ownership requirements for small captive insurance companies. Contemporaneous records reveal a more complicated picture. It is true that Dr. Patel and his advisers sought ways to comply with new ownership requirements for small captives. However, as discussed in more detail below, correspondence with Dr. Patel's advisers reveals that they were concerned about Dr. Patel's ability to meet ownership guidelines to retain favorable tax treatment (including increased limits on deductibility) and reduce his potential estate tax exposure.

### 1. *Decision to Form Plymouth*

In February 2016, Mr. Fay emailed Mr. Sean King, informing him that Dr. Patel "wants to get his estate planning in order and then move forward with his new captive this year." In that same email, Mr. Fay stated that Dr. Patel's accountant had been contacted by the IRS about Dr. Patel's captive. According to the email, several captives formed by Mr. Coomes were being examined by the IRS.

The next day, Mr. Thomas King of CIC Services emailed Mr. Fay to make sure he was aware of "the process of a captive of ours being audited." Mr. Thomas King advised that once a client receives notice of their captive being audited, they should contact him by telephone and then Mr. Coomes, who would take over and respond to any IRS requests.

Two days later, Mr. Thomas King emailed Mr. Fay and Mr. Sean King, copying Bryan Ridgway of CIC Services and Mr. Coomes. He stated that he informed Dr. Patel of the "audit situation" and that Dr. Patel was "fine" with it and "really wants to start another captive." Mr. Thomas King also asked Mr. Fay whether he could "do the captive first and then build the estate planning around it."

[*13]  In response, Mr. Sean King stated that "[t]he only estate planning question with regard to the captive would be who should own it. If we can firm that up, then proceeding with it shouldn't impact the estate planning too much." Subsequent emails over the next several months also discussed the ownership structure of Magellan and Dr. Patel's anticipated second captive, all for the purpose of determining the new captive's impact on Dr. Patel's estate planning and income tax benefits.

In October 2016—after months of discussing the structure of a new captive—Dr. Patel entered into a formal agreement with Mr. Coomes and CIC Services to handle the formation and management of a new captive. Dr. Patel decided to move forward despite being on notice that the IRS was examining the captives formed by Mr. Coomes.

And this was not the first time Dr. Patel was made aware of concerns regarding certain captives. In February 2015, Dr. Patel's nephew—a tax attorney—emailed him an article about captive insurance companies being a "topic of conversation" for Congress and the IRS, and the nephew noted that they will "likely be coming under heightened review/scrutiny."

On November 15, 2016, Mr. Fay sent an email to schedule a conference call with Mr. Sean King, Mr. Coomes, and Norm Lofgren (referred to by Mr. Fay as "Sunil's tax attorney") to discuss "ownership of the new captive," and he noted that Mr. Lofgren was included to "explore all potential options to minimize future estate taxes." Two days later, on November 17, 2016, Mr. Fay sent an email to Ms. Guerrero and asked her to inform Dr. Patel that he would be having a conference call the following week with Mr. Coomes, Mr. Sean King, and Mr. Lofgren to discuss "ownership for the captive and options to reduce future estate taxes."

### 2. *Formation and Ownership of Plymouth*

On November 27, 2016, Mr. Ridgway submitted a proposed charter and bylaws for Plymouth to the TDCI. That charter was approved on December 5, 2016, and on December 8, 2016, Dr. Patel officially formed Plymouth as a licensed captive insurance company in Tennessee.

Dr. Patel placed 100 percent ownership of Plymouth in Linus Capital, LLC (Linus Capital), a Texas limited liability company. In turn, Linus Capital is owned by the Sunil Patel 2016 Irrevocable Trust, created on December 19, 2016.

**[\*14]** In 2016, Plymouth was capitalized with $25,000 in cash and a $225,000 Irrevocable Letter of Credit from Dr. Patel. On December 15, 2016, Mr. Fay inquired in an email whether the $25,000 was a loan or capital. He noted that Dr. Patel would likely increase his contribution to Plymouth "to approx[imately] $1 million while adding $1.1 million to [the] other captive to meet the 2017 2.1-2.2 million increase" in tax benefits for microcaptives. In response, Mr. Lofgren stated that Dr. Patel's "funds to the LLC will be in the form of a loan since we do not want him to own any part of the underlying captive for federal estate tax purposes."

In 2017—after the tax years at issue—Plymouth purchased a Flexible Premium Adjustable and Index-Linked Universal Life Insurance policy with planned premiums of $348,179 and a death benefit of $10 million. Mr. Thomas King believed the entire death benefit of the life insurance policy would pass through Plymouth to Dr. Patel's family.

### E. *Policies Issued by Magellan and Plymouth*

During the tax years at issue, Magellan—and Plymouth in 2016—issued direct written policies to OST and ICR, and SCR.[11] Each year, Mr. Coomes sent a Master Application and Supplemental Applications to Dr. Patel and Ms. Guerrero. Mr. Coomes transmitted those applications to Mr. Rosenbach, who then purportedly priced the insurance premiums as discussed more fully *infra* Findings of Fact Part III.H. Mr. Coomes drafted the policies that Magellan and Plymouth issued to OST, ICR, and SCR.

The tables below outline the policies issued by Magellan and Plymouth from 2013 through 2016. They include premium amounts, occurrence limits, and aggregate limits for each policy.

| Magellan (OST – 2013) | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $86,000 | $1,000,000 | $2,000,000 |
| Computer Operations and Data | 45,300 | 1,000,000 | 2,000,000 |
| Commercial Crime | 19,400 | 1,000,000 | 2,000,000 |
| Employment Practices | 33,300 | 1,000,000 | 2,000,000 |
| Litigation Defense Expense | 70,300 | 1,000,000 | 2,000,000 |
| Tax Indemnity | 59,200 | 1,000,000 | 1,000,000 |

---

[11] Direct written policies to SCR began in 2015.

| | | | |
|---|---|---|---|
| **[*15]** Business Interruption (Loss of Key Employee)/Extra Expense (EE) | 100,800 | 1,000,000 | 1,000,000 |
| Business Interruption (Competitors)/EE | 59,200 | 1,000,000 | 3,000,000 |
| Business Interruption (Reputational Damage)/EE | 102,700 | 1,000,000 | 3,000,000 |
| Business Interruption (Reg. and Leg. Change)/EE | 177,600 | 1,000,000 | 3,000,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 69,400 | 1,000,000 | 1,000,000 |

| Magellan (ICR – 2013) | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $38,800 | $500,000 | $500,000 |
| Computer Operations and Data | 23,100 | 500,000 | 500,000 |
| Commercial Crime | 11,100 | 500,000 | 500,000 |
| Employment Practices | 15,700 | 500,000 | 500,000 |
| Litigation Defense Expense | 30,500 | 500,000 | 500,000 |
| Tax Indemnity | 27,700 | 500,000 | 500,000 |
| Business Interruption (Loss of Key Employee)/EE | 44,400 | 500,000 | 500,000 |
| Business Interruption (Contract Cancellation)/EE | 57,300 | 500,000 | 500,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 35,100 | 500,000 | 500,000 |

| Magellan (OST – 2014) | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $68,400 | $1,000,000 | $2,000,000 |
| Computer Operations and Data | 41,600 | 1,000,000 | 2,000,000 |
| Commercial Crime | 15,700 | 1,000,000 | 2,000,000 |
| Employment Practices | 30,500 | 1,000,000 | 2,000,000 |
| Litigation Defense Expense | 60,100 | 1,000,000 | 2,000,000 |
| Tax Indemnity | 62,900 | 1,000,000 | 1,000,000 |
| Business Interruption (Loss of Key Employee)/EE | 96,200 | 1,000,000 | 1,000,000 |
| Business Interruption (Competitors)/EE | 56,400 | 1,000,000 | 3,000,000 |
| Business Interruption (Reputational Damage)/EE | 97,100 | 1,000,000 | 3,000,000 |
| Business Interruption (Reg. and Leg. Change)/EE | 170,200 | 1,000,000 | 3,000,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 64,700 | 1,000,000 | 1,000,000 |

| Magellan (ICR – 2014) | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $28,700 | $500,000 | $500,000 |
| Computer Operations and Data | 26,800 | 500,000 | 500,000 |
| Commercial Crime | 8,300 | 500,000 | 500,000 |

| | Premium | Occ. Limit | Agg. Limit |
|---|---|---|---|
| **[*16]** Business Interruption (Loss of Key Employee)/EE | 49,900 | 500,000 | 500,000 |
| Business Interruption (Contract Cancellation)/EE | 72,100 | 500,000 | 500,000 |
| Special Catastrophic Risk | 32,400 | 500,000 | 500,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Tax Indemnity | 31,400 | 500,000 | 500,000 |
| Litigation Defense Expense | 25,900 | 500,000 | 500,000 |
| Employment Practices Liability Insurance | 12,000 | 500,000 | 500,000 |

| *Magellan (OST – 2015)* | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $74,000 | $1,000,000 | $2,000,000 |
| Computer Operations and Data | 35,100 | 1,000,000 | 1,000,000 |
| Commercial Crime | 14,800 | 1,000,000 | 1,000,000 |
| Employment Practices | 20,300 | 1,000,000 | 1,000,000 |
| Litigation Defense Expense | 43,500 | 1,000,000 | 2,000,000 |
| Tax Indemnity | 59,200 | 1,000,000 | 1,000,000 |
| Business Interruption (Loss of Key Employee)/EE | 115,600 | 1,000,000 | 1,000,000 |
| Business Interruption (Reputational Damage)/EE | 103,600 | 1,000,000 | 2,000,000 |
| Business Interruption (Reg. and Leg. Change)/EE | 181,300 | 1,000,000 | 2,000,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 55,500 | 1,000,000 | 1,000,000 |

| *Magellan (ICR – 2015)* | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $22,200 | $500,000 | $500,000 |
| Computer Operations and Data | 26,800 | 500,000 | 500,000 |
| Commercial Crime | 8,300 | 500,000 | 500,000 |
| Employment Practices | 8,300 | 500,000 | 500,000 |
| Litigation Defense Expense | 12,000 | 500,000 | 500,000 |
| Tax Indemnity | 29,600 | 500,000 | 500,000 |
| Business Interruption (Loss of Key Employee)/EE | 66,600 | 500,000 | 500,000 |
| Business Interruption (Contract Cancellation)/EE | 65,700 | 500,000 | 500,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 27,700 | 500,000 | 500,000 |

| *Magellan (SCR – 2015)* | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | 10,200 | $500,000 | $500,000 |
| Computer Operations | 9,200 | 500,000 | 500,000 |
| Business Interruption (Contract Cancellation)/EE | 23,100 | 500,000 | 500,000 |

| | | | |
|---|---|---|---|
| **[*17]** Commercial Crime | 7,400 | 500,000 | 500,000 |
| Employment Practices | 5,500 | 500,000 | 500,000 |
| Litigation Defense Expense | 4,600 | 500,000 | 500,000 |
| Tax Indemnity | 17,600 | 500,000 | 500,000 |
| Business Interruption (Loss of Key Employee)/EE | 16,600 | 500,000 | 500,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 27,700 | 500,000 | 500,000 |

| Magellan (ICR – 2016) | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $24,000 | $500,000 | $500,000 |
| Computer Operations and Data | 26,800 | 500,000 | 500,000 |
| Commercial Crime | 8,300 | 500,000 | 500,000 |
| Employment Practices | 9,200 | 500,000 | 500,000 |
| Litigation Defense Expense | 13,900 | 500,000 | 500,000 |
| Tax Indemnity | 29,600 | 500,000 | 500,000 |
| Business Interruption (Loss of Key Employee)/EE | 59,200 | 500,000 | 500,000 |
| Business Interruption (Contract Cancellation)/EE | 96,200 | 500,000 | 500,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 27,700 | 500,000 | 500,000 |
| Crisis Coach | 5,000 | 100,000 | 100,000 |

| Magellan (SCR – 2016) | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $11,100 | $500,000 | $500,000 |
| Computer Operations and Data | 9,200 | 500,000 | 500,000 |
| Business Interruption (Contract Cancellation)/EE | 32,400 | 500,000 | 500,000 |
| Commercial Crime | 7,400 | 500,000 | 500,000 |
| Employment Practices | 5,500 | 500,000 | 500,000 |
| Litigation Defense Expense | 5,500 | 500,000 | 500,000 |
| Tax Indemnity | 17,600 | 500,000 | 500,000 |
| Business Interruption (Loss of Key Employee)/EE | 13,900 | 500,000 | 500,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 27,700 | 500,000 | 500,000 |
| Crisis Coach | 5,000 | 100,000 | 100,000 |

| Plymouth (OST – 2016) | | | |
|---|---|---|---|
| *Policy* | *Premium* | *Occ. Limit* | *Agg. Limit* |
| Administrative Actions | $78,600 | $1,000,000 | $2,000,000 |
| Computer Operations and Data | 35,100 | 1,000,000 | 1,000,000 |
| Commercial Crime | 14,800 | 1,000,000 | 1,000,000 |
| Employment Practices | 20,300 | 1,000,000 | 1,000,000 |
| Litigation Defense Expense | 41,600 | 1,000,000 | 2,000,000 |

| | | | |
|---|---|---|---|
| **[*18]** Tax Indemnity | 62,900 | 1,000,000 | 1,000,000 |
| Business Interruption (Loss of Key Employee)/EE | 131,300 | 1,000,000 | 1,000,000 |
| Business Interruption (Reputational Damage)/EE | 117,500 | 1,000,000 | 2,000,000 |
| Business Interruption (Reg. and Leg. Change)/EE | 62,000 | 1,000,000 | 2,000,000 |
| Legal Expense | 14,000 | 20,000 | 20,000 |
| Special Catastrophic Risk | 55,500 | 1,000,000 | 1,000,000 |
| Bus. Interruption (Natural Perils)/EE | 32,400 | 1,000,000 | 2,000,000 |
| Crisis Coach | 5,000 | 100,000 | 100,000 |
| Bus. Interruption (Property Damage)/EE | 44,400 | 1,000,000 | 2,000,000 |

To summarize, the captive policies fell into the following categories of coverage:

1. Administrative Actions
2. Business Interruption (Natural Peril)
3. Business Interruption (Broad Form Property Damage)
4. Business Interruption (Competitors)
5. Business Interruption (Customer Contract Cancellation)
6. Business Interruption (Loss of Key Employees)
7. Business Interruption (Regulatory & Legislative Change)
8. Business Interruption (Reputational Damage)
9. Commercial Crime
10. Computer Operations and Data
11. Crisis Coach
12. Employment Practices
13. Legal Expense
14. Litigation Defense Expense
15. Tax Indemnity
16. Special Catastrophic Risk

Summaries of the coverage for each of the policies are generally contained in Coverage Summary forms. The following list describes, in simplified terms, the coverages for Magellan for the tax years at issue.

**Administrative Actions**: "This covers losses (i.e., legal expenses, fines and assessments) from investigations, audits and proceedings brought against the Insured by governmental bodies. Tax related administrative actions are excluded."

**[*19]** **Business Interruption (also referred to as Business Income) (Natural Perils) and Extra Expense Insurance**: This "covers loss of profits and extra expenses resulting from the temporary suspension of the Insured's operations due to inclement weather conditions or a natural disaster, including but not limited to, a flood, earthquake or tornado."

**Business Interruption (also referred to as Business Income) (Broad Form Property Damage) and Extra Expense Insurance**: This "covers loss of profits and extra expenses resulting from the interruption of the Insured's operations due to (i) damage or breakdown of the Insured's property (including tangible and intangible personal property and real property), (ii) utility service interruptions including, but not limited to, interruptions of the Insured's telecommunications systems and (iii) loss of access to the Insured's premises by the Insured, its employees, suppliers or customers."

**Business Interruption (also referred to as Business Income) (Entrance by Competitors) and Extra Expense Insurance**: "This covers loss of profits resulting from the entrance by a competitor in the Insured's business."

**Business Interruption (also referred to as Business Income) (Customer Contract Cancellation) and Extra Expense Insurance**: This "covers loss of income and extra expenses resulting from the cancellation of one or more key contracts by a customer of the Insured or from the bankruptcy or liquidation of any key customer who is a party to such key contract."

**Business Interruption (also referred to as Business Income) (Loss of Key Employee) and Extra Expense Insurance**: "This covers loss of profits resulting from the retirement or voluntary departure of a key employee of the Insured.

**Business Interruption (also referred to as Business Income) (Regulatory and Legislative Changes) and Extra Expense Insurance**: This "covers loss of profits

**[*20]** and extra expenses resulting from legislative, regulatory, administrative and governmental changes adversely affecting the Insured's operations."

**Business Interruption (also referred to as Business Income) (Reputational Damage) and Extra Expense Insurance**: This "covers loss of profits and extra expenses resulting from negative publicity that cause damage to the Insured's reputation in the marketplace."

**Commercial Crime**: This "covers losses resulting from or related to theft or dishonesty committed by employees of the Insured or by third parties including, but not limited to, investigative expenses incurred by the Insured."

**Computer Operations and Data**: This "covers losses (i.e. expenses incurred and lost income) resulting from attacks, breakdowns, and malfunctions and security breaches of the Insured's computers, computer programs and servers (and related peripheral equipment) including but not limited to, the cost to replace or restore data and computer programs, the cost of data entry, the cost of reprogramming and computer consultation service, public relations expenses incurred to protect or restore your reputation, monetary payments, fees, fines and penalties imposed against the Insured by credit card associations and expenses related to extortion threats that caused an interruption of the Insured's operations."

**Crisis Coach Insurance**: "This covers crisis management expenses resulting from a crisis event involving the Named Insured."

**Employment Practices Insurance**: "This covers losses resulting from claims made by employees, former employees, or potential employees of the Insured for wrongful termination of employment, sexual harassment and other employment-related allegations and certain claims made by third parties for wrongful discrimination."

**Legal Expense Insurance**: "This covers legal expenses incurred by the Insured (or an employee, officer or director of the Insured) for defending claims against the Insured (or an employee, officer o[r] director of the Insured) or for the

**[\*21]** consultation thereof, for prosecuting any claims by the Insured against third parties and for the consultation thereof, and for the Insured's participation in any arbitration, mediation or other alternative dispute [resolution] proceeding."

**Litigation Defense Expense Insurance**: "This covers litigation expenses incurred by the Insured for defending claims that fall outside certain specified commercial liability policies of the Insured or for defending claims that are in excess of the limits of such existing liability policies. This Policy also covers the deductible(s) on such liability policies. This insurance policy only applies to such litigation expenses after the limits of the Legal Expense Insurance Policy have been exhausted."

**Tax Indemnity Insurance**: "This covers losses from tax payments, including interest and penalties, and tax assessments, including associated expenses (i.e. legal, consulting and accounting expenses) which arise out of an audit of any foreign, federal, state or local tax return of the Insured."

**Special Catastrophic Risk Insurance**: "This covers loss of profits and property resulting from the accidental or intentional disruption of critical infrastructure such as transportation systems, electrical power systems, gas and oil storage and transportation systems, banking and finance, transportation systems and water supply systems."

Plymouth provided substantially similar insurance coverage beginning in 2016.

The parties' experts agree that the Magellan and Plymouth policies generally contain terms one would typically see in insurance policies. For example, David Russell, an expert offered by respondent, observed that certain coverages are generally available in the marketplace, including crime, employment practices, and computer data. The Patels' expert, Michael Angelina, also agrees that the policies issued by Magellan and Plymouth contain terms that are similar to those contained in commercial insurance policies, including policy forms containing declarations, the insuring agreement, and other provisions.

[*22] However, the policies also contain atypical provisions. For example, the policies operate under "claims made and reported" terms, requiring the insured to report the loss before the expiration of the policy. In the insurance industry, such provisions are considered unfavorable to insureds.[12] The policies also contain a provision stating that all policies provide excess insurance to other coverage, such as Dr. Patel's commercial insurance. However, high premiums are typically indicative of primary insurance coverage. Another atypical provision is that the policies cannot be canceled, and premiums are considered fully earned at inception, meaning that no refund is due to the insured.

### F.     *Capstone's Reinsurance Program*

From the beginning, Mr. Coomes recognized that a captive insurance company is "required to 'distribute risk' in order to be treated as an insurance company for tax purposes." In a memorandum to potential members of the Capstone reinsurance arrangement, Mr. Coomes emphasized the need for a microcaptive to obtain risk distribution and noted that the IRS considers the risk distribution requirement satisfied if the "risk borne by your [microcaptive] is spread among one or more insureds that are unrelated" to the captive. Further, he stated that, according to caselaw, "30% of the total premiums received by an insurance company from unrelated insureds represents a significant portion of its risk." He also stated that "safe harbor provisions of the Revenue Ruling 2002-89 take a more strict position requiring more than 50% of the total premiums received by an insurance company to be received from unrelated insureds."

Applying his analysis, Mr. Coomes sought to create a pooling arrangement through Capstone to distribute risk among the captives he formed. Captives participating in the pooling arrangement did so via two instruments: (1) a Reinsurance Agreement; and (2) an accompanying Quota Share Retrocession Agreement.

Under the Reinsurance Agreements for each year, Capstone agreed to reinsure 51 percent of the Ultimate Net Loss of each Covered Policy. Ultimate Net Loss is defined under the agreements as "the actual loss paid or payable by [Magellan or Plymouth] from the settlement or compromise of claims . . . arising from one or more Covered Policies." In other words, as part of the Reinsurance Agreements, Magellan and

---

[12] In contrast, a typical claims-made policy permits an insured to report claims for a certain period after the expiration of the policy.

[*23] Plymouth—and other captives—paid fifty-one percent of the premiums they received from their insured customers—for example, OST, ICR, and SCR—to Capstone.

Mr. Coomes billed Magellan and Plymouth yearly, and the invoices represented 51 percent of the total premiums plus a "risk distribution" ceding fee of $5,000 charged by Capstone. The Reinsurance Agreements also provided that in the event of insolvency of the reinsured, the maximum amount recoverable by the reinsured is the amount of reinsurance premiums paid to Capstone.

As participants in the Capstone program, Magellan and Plymouth were also parties to the Quota Share Retrocession Agreement. Under that agreement, members of Capstone agreed to collectively assume 100 percent of the losses Capstone incurred under the various Reinsurance Agreements it entered with the participating captives in the pool. According to the agreement, the captives participating in the Capstone pooling arrangement were purportedly not liable for any losses on policies they directly wrote to their own insureds. Presumably, this provision was added to the Quota Share Retrocession Agreement because of Mr. Coomes's concern that the captives would not otherwise appear to achieve risk distribution.

In exchange for their agreement to reinsure a quota share of Capstone losses, Capstone paid its members a Quota Share Reinsurance Premium. Within days, and no later than December 31 of the year, Capstone returned half of the money paid by Magellan and Plymouth. The remaining half was paid into the Capstone Trust, and within six to seven months, Capstone returned 70 percent of the money held in the trust. Thus, within six to eight months, approximately 85 percent of money was returned to Magellan and Plymouth during the tax years at issue. The remaining 15 percent was left in the trust until all claims were paid. Thus, although only 15 percent remained to pay claims, 50 percent of exposure remained.

In other words, as participants in the Capstone arrangement, Magellan and Plymouth paid 51 percent of their premiums into the pooling arrangement. And in less than a year, they received a large percentage of funds back as part of the quota share agreement. The quota share that Magellan and Plymouth assumed under the quota share agreement for each tax year at issue was calculated so that these entities received payments from Capstone that were roughly equal to

**[\*24]** the premiums Capstone was entitled to receive from Magellan and Plymouth as part of the reinsurance agreement.

This flow of funds is best represented by the following figures prepared by Mr. Russell. Figure A[13] represents the steps in the flow of funds from OST, ICR, and SCR to Magellan (or Plymouth) to Capstone and back again.

## Figure A: Flow of Funds from Patel Entities to Reinsurer and Back



Further, as noted by Mr. Russell, accounting statements for Capstone illustrate the flow of premiums between Magellan and Capstone. For example, in 2013, Magellan ceded $578,799 in premiums to Capstone for 2013 reinsurance coverage and assumed the exact same amount for a quota share retrocession with Capstone. After a relatively small amount in losses was ultimately assumed, Magellan received a total of $551,284.89 back from Capstone, or over 95 percent of premiums.

This pattern of a circular flow of funds is illustrated in Figure B, prepared by Mr. Russell:

---

[13] Figure A contains a typographical error original to Mr. Russell's report. In the "Steps in the Flow of Funds" box, the word "retocedes" should be "retrocedes." In addition, a "retrocessionaire" in Figure A refers to a reinsurer of Capstone. Magellan and Plymouth are reinsurers, or retrocessionaires, of Capstone.

**[\*25]**

## Figure B: Flow of Funds from Patel Entities to Reinsurer and Back



At the time Dr. Patel's entities joined the Capstone pooling arrangement, he did not know anything about the other pool members, including their risks, industries, ability to fulfill their quota share claims, or captive insurance policies.

### G.   *Dr. Patel's Commercial Insurance Coverage*

Despite obtaining numerous policies through his captives, Dr. Patel also purchased insurance coverage with third-party commercial insurers throughout the tax years at issue for each of his entities. OST and ICR maintained commercial insurance policies that covered regulatory, malpractice, worker's compensation, automobile, and umbrella risks and included a general business owners' package.

Mr. Russell provided a general assessment of the commercial insurance policies in place during the tax years at issue. The following list is a summary he prepared that contains a nonexhaustive general overview of the commercial policies:

**Businessowners Package Policy (BOP)**: This policy provides a package of several property and liability coverages needed by a small business. The property coverages include: 1) coverage for losses to a building owned by the insured; 2) coverage for losses to the business personal property (e.g. furnishings and equipment) owned

[*26] by the business; 3) coverage for lost profits and extra expenses during an interruption to business from a covered loss; and 4) several other smaller coverages including glass, accounts receivable coverage (for records that have been damaged or destroyed), fine art and other coverage extensions. The liability protections include general liability [GL] and medical payments coverage; these cover losses and legal defense brought by third parties, not including medical malpractice.

**Business Auto Policy (Auto)**: This policy provides liability and property protection to the insured against claims brought by third parties as well as property damage to the insured's vehicles. This policy also provides protection against injuries caused by uninsured and underinsured motorists as well as personal injury protection for injuries suffered by the insured and passengers in the insured's vehicles.

**Umbrella Policy (Umbrella)**: This policy provides additional liability coverage if the applicable coverage limits of business auto or general liability coverages are exhausted.

**Workers Compensation and Employers Liability (WC/EL)**: This policy provides the insured with protection against employee injury obligations, including medical expenses, lost wages and claims brought by third parties as the result of worker injuries.

**e-MD Network Security and Privacy/Broad Regulatory Protection Plus (eMD/Regulatory+)**: This policy provides a medical facility or office with a package of coverages for losses and expenses that result from events including breaches of digital privacy, Cyber Liability, Cyber Terrorism, Cyber Extortion, Network Assets and Breach Coverage. In addition, the policy includes coverage (if permitted by law) for regulatory proceedings costs, fines and penalties, shadow audit expenses and other claims expenses for wrongful acts, errors and omissions.

**[\*27]** The tables below present general summaries of the insurance coverage the Patels maintained through commercial insurers for the tax years at issue:

| Year | Insured | Insurer | Coverage | Prem. | Occ. Limit | Agg. Limit |
|------|---------|---------|----------|-------|-----------|-----------|
| 2012 | OST + ICR | Travelers Casualty | Auto | $8,831 | $1,000,000 | $1,000,000 |
| 2012 | OST + ICR | Travelers Lloyds | BOP/GL | 11,791 | 1,000,000 | 2,000,000 |
| 2012 | OST + ICR | Travelers Lloyds | BOP Prop. | | 2,794,480 | 2,794,480 |
| 2012 | OST + ICR | Travelers Lloyds | BOP Bus. Pers. Prop. | | 3,075,791 | 3,075,791 |
| 2012 | OST | Lloyds/ NAS | eMD/Regulatory + | 4,091 | 1,000,000 | 3,000,000 |
| 2012 | OST + ICR | Travelers Indem. | Umbrella | 2,123 | 2,000,000 | 2,000,000 |
| 2012 | OST | Texas Mutual | WC/EL | 11,829 | 1,000,000 | 1,000,000 |
| 2012 | OST | OMIC | Med. Mal./Prof. Liability | 30,253 | 1,000,000 | 3,000,000 |

| Year | Insured | Insurer | Coverage | Prem. | Occ. Limit | Agg. Limit |
|------|---------|---------|----------|-------|-----------|-----------|
| 2013 | OST + ICR | Travelers Casualty | Auto | $11,119 | $1,000,000 | $1,000,000 |
| 2013 | OST + ICR | Travelers Lloyds | BOP/GL | 14,620 | 1,000,000 | 2,000,000 |
| 2013 | OST + ICR | Travelers Lloyds | BOP Prop. | | 2,906,259 | 2,906,259 |
| 2013 | OST + ICR | Travelers Lloyds | BOP Bus. Pers. Prop. | | 3,193,821 | 3,193,821 |
| 2013 | OST | Lloyds/ NAS | eMD/Regulatory + | 6,609 | 1,000,000 | 5,000,000 |
| 2013 | OST + ICR | Travelers Indem. | Umbrella | 2,478 | 2,000,000 | 2,000,000 |
| 2013 | OST | Texas Mutual | WC/EL | 14,290 | 1,000,000 | 1,000,000 |
| 2013 | OST | OMIC | Med. Mal./Prof. Liability | 36,559 | 1,000,000 | 3,000,000 |

[*28]

| Year | Insured | Insurer | Coverage | Prem. | Occ. Limit | Agg. Limit |
|------|---------|---------|----------|-------|-----------|-----------|
| 2014 | OST + ICR | Travelers Casualty | Auto | $11,336 | $1,000,000 | $1,000,000 |
| 2014 | OST + ICR | Travelers Indem. | BOP/GL | 19,708 | 1,000,000 | 2,000,000 |
| 2014 | OST + ICR | Travelers Indem. | BOP Prop. | | 5,053,446 | 5,053,446 |
| 2014 | OST + ICR | Travelers Indem. | BOP Bus. Pers. Prop. | | 3,564,668 | 3,564,668 |
| 2014 | OST | Lloyds/ NAS | eMD/Regulatory + | 6,609 | 1,000,000 | 5,000,000 |
| 2014 | OST + ICR | Travelers Indem. | Umbrella | 2,825 | 2,000,000 | 2,000,000 |
| 2014 | OST | Texas Mutual | WC/EL | 16,031 | 1,000,000 | 1,000,000 |
| 2014 | OST | OMIC | Med. Mal./Prof. Liability | 43,365 | 1,000,000 | 3,000,000 |

| Year | Insured | Insurer | Coverage | Prem. | Occ. Limit | Agg. Limit |
|------|---------|---------|----------|-------|-----------|-----------|
| 2015 | OST + ICR | Travelers Casualty | Auto | $11,238 | $1,000,000 | $1,000,000 |
| 2015 | OST + ICR | Travelers Indem. | BOP/GL | 22,442 | 1,000,000 | 2,000,000 |
| 2015 | OST + ICR | Travelers Indem. | BOP Prop. | | 5,255,583 | 5,255,583 |
| 2015 | OST | Travelers Indem. | BOP Bus. Pers. Prop. | | 3,702,253 | 3,702,253 |
| 2015 | OST | Lloyds/ NAS | eMD/Regulatory + | 2,678 | 1,000,000 | 4,000,000 |
| 2015 | OST + ICR | Travelers Indem. | Umbrella | 2,994 | 2,000,000 | 2,000,000 |
| 2015 | OST | Texas Mutual | WC/EL | 15,456 | 1,000,000 | 1,000,000 |
| 2015 | OST | OMIC | Med. Mal./Prof. Liability | 40,112 | 1,000,000 | 3,000,000 |

[*29]

| Year | Insured | Insurer | Coverage | Prem. | Occ. Limit | Agg. Limit |
|---|---|---|---|---|---|---|
| 2016 | OST + ICR | Travelers Casualty | Auto | $13,576 | $1,000,000 | $1,000,000 |
| 2016 | OST + ICR | Travelers Indem. | BOP/GL | 36,787 | 1,000,000 | 2,000,000 |
| 2016 | OST + ICR | Travelers Indem. | BOP Prop. | | 6,000,000 | 6,000,000 |
| 2016 | OST + ICR | Travelers Indem. | BOP Bus. Pers. Prop. | | 6,832,912 | 6,862,912 |
| 2016 | OST | Lloyds/ NAS | eMD/Regulatory + | 3,249 | 1,000,000 | 3,000,000 |
| 2016 | OST + ICR | Travelers Indem. | Umbrella | 3,446 | 2,000,000 | 2,000,000 |
| 2016 | OST | Texas Mutual | WC/EL | 14,499 | 1,000,000 | 1,000,000 |
| 2016 | OST | OMIC | Med. Mal./Prof. Liability | 28,199 | 1,000,000 | 3,000,000 |

The combined commercial premiums for the tax years at issue totaled $462,704 and ranged between approximately $68,000 and $106,000 per year for the three entities. In contrast, during the same tax years at issue, Dr. Patel's businesses paid premiums to Dr. Patel's captives totaling just over $4.5 million.

The Patels maintained this commercial insurance coverage despite Dr. Patel stating that he has an inherent distrust of commercial insurance. Further, Dr. Patel did not place his medical malpractice insurance coverage with his captives, despite also professing that one purpose of forming the microcaptives stemmed from a medical malpractice incident. Nor did he ever consult with his longtime commercial insurance agent about forming a microcaptive, including whether he could obtain comparable—or even cheaper—coverage through his commercial carriers.

H.    *Premium Pricing*

The parties' experts agree that an insurance premium is typically determined by an actuary who uses actuarially sound methodologies. Here, there is evidence that premium pricing was determined in two ways. First, Mr. Coomes hired Mr. Rosenbach to develop policy

**[\*30]** premiums for Magellan and Plymouth. But there is also evidence in the record indicating that Dr. Patel and his employee directed premium amounts. We will address each in turn.

### 1.  *Mr. Rosenbach's Captive Pricing*

From the start, Mr. Rosenbach proved himself flexible in preparing premium pricing. For each policy period, he prepared pricing reports. According to the reports, he was hired to "[d]evelop reasonable premium estimates for insurance policies expected to be issued" by Magellan. In broad terms, Mr. Rosenbach's reports state that "[w]here comparable coverages were identified, the base rates and rating factors developed in this report were based on a survey of rating plans obtained from regulatory filings submitted by commercial insurance carriers" in the United States. He also stated that "commercial rates and rating factors selected represent a reasonable basis from which to develop premium estimates for comparable coverages" provided by Magellan.

Where comparable coverages were not available, Mr. Rosenbach used stock language in his pricing reports for each policy[14] and stated that he used "professional judgment to develop reasonable rating guidelines to reflect the expected loss potentials." Finally, he stated that base rates were created using "historical consistency and rate-on-line ranges." Despite these statements in the reports—which were created contemporaneously at the time policies were issued by Magellan and Plymouth—Mr. Rosenbach did not otherwise credibly or adequately explain the basis for his premium amounts. Rather, the Premium Development reports contain little to no explanation for how he arrived at the amounts he ultimately recommended.

But in connection with this litigation, Mr. Rosenbach created an expert report attempting to explain his premium calculations. According to Mr. Rosenbach, his pricing process involved determining a base premium for each policy and then adjusting that base by various factors. He also claimed that he determined a base rate by using comparable coverages, typically from public filings from Chubb, a large insurance company, where available, and then applied additional factors to reach the premium amounts for the captives.

---

[14] The language Mr. Rosenbach used in his pricing reports in these cases appears to be identical to language he used in such reports in *Swift v. Commissioner*, T.C. Memo. 2024-13, at \*16.

**[*31]** However, Mr. Rosenbach's calculations and additional factors resulted in premium amounts far removed from the Chubb premium pricing. He used factors that are not typically used by actuaries, nor are these factors defined in actuarial literature. Further, the additional factors are undocumented and, as noted by Ms. Garland, so large that they bear no relation to the commercial rates that he starts with. Despite having several years' worth of insurance data, he did not adjust the pricing of the policies with the additional information that became available over time, though his reports stated that he would do so.

The premium amounts Mr. Rosenbach calculated were significantly higher than the commercial premium amounts for the same or similar types of coverage. For example, the rate-on-line—a measure of the cost of insurance—was up to 12 times higher for the Patels' captive insurance compared to their commercial insurance. During the tax years at issue, the average rate-on-line for the captives' policies ranged from over 4 percent to over 7 percent, depending on the calculation method used. In contrast, the average rate-on-line for the commercial policies was typically below 1 percent, depending on the calculation method used.

As an example of the excessively high premium amounts for the microcaptive policies, the limit of liability for legal expense policies issued by Magellan and Plymouth for the tax years at issue is only $20,000, but the premium is $14,000 a year, which amounts to a rate-on-line of 70 percent. In contrast, Dr. Patel's BOP commercial coverage for the 2013 through 2014 period charged a similar premium amount ($16,981), but it covered property up to a limit of $4 million and liability—including legal expense—up to a limit of $2 million. The BOP policy has a rate-on-line of less than one percent.

In addition, Mr. Rosenbach stated that he developed the premium pricing with the expectation that the coverages would be "high severity and low frequency," meaning that the insured entities would be loss free for many years. Yet, contemporaneous records do not support Mr. Rosenbach's post hoc justification for high premiums. Records reveal that Mr. Rosenbach anticipated loss ratios for Magellan between 56 and 57.1 percent. Relatedly, records reveal that Mr. Rosenbach expected Plymouth to experience loss ratios of 40 percent to 70 percent. These numbers are not consistent with Mr. Rosenbach's assertion that he expected Magellan to be loss free for many years.

**[\*32]**  Moreover, the high premium amounts are not consistent with Mr. Rosenbach's contention that the rates were developed for "low frequency" lines of business. As noted by Ms. Garland, for a single insured, "low frequency" would suggest a claim every 10 to 20 years. However, a premium of nearly $1 million is consistent with a claim every year in the range of $500,000 to $700,000. Neither Magellan nor Plymouth had claim history supporting a claim every year. Yet the Patels paid Magellan and Plymouth more than $1 million in policy premiums each year.

Further, Mr. Coomes could not recall whether he ever instructed Mr. Rosenbach to (1) increase or decrease a premium amount; (2) target a certain premium level; or (3) increase or decrease premium amounts based on a request from a client. But Mr. Rosenbach was aware of the $1.2 million limit on exclusion from taxability under section 831(b), which was later increased to $2.2 million. He also testified that he believed the final pricing reports he prepared for Mr. Coomes's clients from 2011 to 2016 always totaled less than $1.2 million in premiums.

Further, in 2014, Mr. Coomes sought advice from another attorney who handled captive insurance companies and asked him whether there was a standard test "when speaking with prospective clients in terms of the maximum amount of premiums that are reasonable based upon the gross or net income of the business? The question of course presumes that all premiums can be justified from an actuarial standpoint."

### 2.  *Dr. Patel's Involvement in Premium Pricing*

Although Mr. Coomes claimed that Mr. Rosenbach developed premium pricing for Dr. Patel's captives, the record reveals that Dr. Patel and his employee provided Mr. Coomes with a target to be hit for the Patel captives' premiums. Contemporaneous emails during the tax years at issue also reveal that Dr. Patel had input regarding the insurance premiums he wanted to pay his captives, including asking for higher premiums. For example, in December 2012, Mr. Ridgway emailed Dr. Patel, inquiring about the amount of total casualty insurance premiums that Dr. Patel would pay for that year. In response, Ms. Guerrero responded that same day: "We are not positive on the amount that should go in the box below. Dr. Patel is thinking the amt is $1,150,000.00. Is this the amount that you are expecting. Please advise." Mr. Ridgway responded: "Yes, that's around the amount we were expecting." Ms. Guerrero responded again that "Dr. Patel wanted to

[*33] know what the max is that we can pay into the captive," to which Mr. Ridgway responded "$1,200,000."

Similarly, in 2014, Ms. Guerrero emailed Mr. Coomes and asked why policy premiums were less than the year before because "Dr. Patel was expecting a little closer to 1.2 million for the both." Mr. Coomes replied that he "simply renewed the same policies at the same limits as last year," premiums had dropped in the commercial market, and they should look at adding other coverages or increasing limits the following year, apparently to increase the total amount of insurance premiums Dr. Patel was paying to the captive. In response, Dr. Patel informed Ms. Guerrero that he wanted to add SCR as an insured in 2015. Thus, in 2015, Magellan began issuing policies to SCR. In August 2015, Ms. Guerrero emailed Mr. Coomes and stated that "Dr. Patel would like to add another company to the captive" and asked where to start.

### 3. *Reinsurance Premium Pricing*

With respect to Capstone's premium pricing structure, Mr. Coomes stated that an actuary developed the 51 percent reinsurance premium for each captive. But there is no credible evidence to support Mr. Coomes's statement. There is no documentation demonstrating that an actuary—whether Mr. Rosenbach or another person—determined the reasonableness of the reinsurance premiums for each captive.

### I. *Claims Activity*

CIC Services handled certain clerical functions for captives in the Capstone pool, including for Magellan and Plymouth. In particular, during the tax years at issue, CIC Services was responsible for reviewing a portion of claims submitted by captives participating in Capstone. Once claims were approved, CIC Services notified Capstone.

In 2013, the Reinsurance Agreement provided that the parties agreed to be bound by the decision of a third-party claims adjuster for any claims exceeding $20,000. However, claims that did not exceed $20,000 would be submitted to the captive manager or a third-party claims adjuster at the discretion of Capstone. From 2014 through 2016, the Reinsurance Agreement provided that Capstone had the discretion to submit all claims to the captive manager.

During the tax years at issue, Mr. Sean King, Mr. Ridgway, and Mr. Thomas King—all with CIC Services—had ownership interests in a captive insurance company that participated in the Capstone pool, while

**[\*34]** at the same time they also approved claims for the Capstone pool. In October 2014, Mr. Coomes raised concerns about employees of CIC Services approving claims when they owned a captive in the same pooling arrangement.

Further, for the 2015 policy period, approximately 14 percent of all approved claims submitted to Capstone related to one claim for $605,669 by Mr. Thomas King. The claim was for Thomas King's loss of income because Minnesota Life Insurance no longer offered life insurance policies to captive insurance companies. Notably, the claim was submitted in 2017, after the policy period was over and after Mr. Thomas King sent an email informing Dr. Patel that the IRS was examining his captives.

During the tax years at issue, Magellan and Plymouth did not pay any claims for the direct policies they issued to OST, ICR, or SCR. They did pay a share of Capstone pool claims, but those claims represent an average loss ratio[15] of less than five percent for Magellan and three percent for Plymouth. By contrast, commercial insurance carriers in the property and casualty industry had an average loss ratio of approximately 70 percent during the same period.

Finally, Capstone claims increased significantly after the IRS began examining Capstone captives, including in subsequent years not at issue here. Most of the claim activity for the 2015 reinsurance pool— which represents the majority of claims activity during the years at issue—occurred after the IRS began examining captives formed by Mr. Coomes.

IV.    *The Patels' Returns and IRS Examination*

The IRS conducted examinations of the Patels' joint federal income tax returns for each of the tax years at issue and issued notices of deficiency to them. For each tax year at issue, respondent determined that neither Magellan nor Plymouth could be treated or taxed as a small insurance company under section 831(b). As a result, the IRS disallowed the amounts deducted as insurance premiums and determined the following deficiencies for the tax years at issue:

---

[15] The insurance industry uses a measure called the "loss ratio" to compare losses and adjustment expenses with premiums earned. As explained by Ms. Garland, a loss ratio of 60 percent means that 60 cents of each premium dollar earned is used to pay claims and associated expenses.

**[*35]**

| Year | Deficiency |
|------|------------|
| 2013 | $247,892 |
| 2014 | 484,420 |
| 2015 | 475,186 |
| 2016 | 529,949 |

## OPINION

I.  *Burden of Proof*

The determinations in a notice of deficiency bear a presumption of correctness, *see Welch v. Helvering*, 290 U.S. 111, 115 (1933), and the taxpayer generally bears the burden of proving them erroneous in proceedings in this Court, *see* Rule 142(a)(1).[16] The taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Thus, a taxpayer claiming a deduction on a federal income tax return must demonstrate that the deduction is provided for by statute and must maintain records sufficient to enable the Commissioner to determine the correct tax liability. *See* § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); Treas. Reg. § 1.6001-1(a).

If, in any court proceeding, the taxpayer puts forth credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer and meets certain other requirements, the burden of proof shifts to the Commissioner. § 7491(a)(1) and (2).[17] When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail; and thus a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340.

---

[16] The Patels once again ask the Court to shift the burden of proof to respondent. The Court has already considered and denied petitioners' pre-trial motion requesting the same relief (*see* Docket No. 24344-17, Order, Doc. 217), and we decline to reconsider their renewed motion.

[17] The U.S. Court of Appeals for the Fifth Circuit, to which an appeal in these cases would presumptively lie, *see* § 7482(b)(1), has also held that if an "assessment is arbitrary and erroneous, the burden shifts to the government to prove the correct amount of any taxes owed," *Portillo v. Commissioner*, 932 F.2d 1128, 1133 (5th Cir. 1991), *aff'g in part, rev'g and remanding in part* T.C. Memo. 1990-68.

**[\*36]** We do not perceive an evidentiary tie in these cases and are able to decide the issues on the preponderance of the evidence. *See, e.g.*, *Swift*, T.C. Memo. 2024-13, at \*26; *Bordelon v. Commissioner*, T.C. Memo. 2020-26, at \*11.

## II.   *Evaluation of Evidence*

In deciding whether a taxpayer has carried his burden of proof, witness credibility is an important consideration. *Ishizaki v. Commissioner*, T.C. Memo. 2001-318, 2001 WL 1658189, at \*7. "[T]he distillation of truth from falsehood . . . is the daily grist of judicial life." *Diaz v. Commissioner*, 58 T.C. 560, 564 (1972). "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." *Kropp v. Commissioner*, T.C. Memo. 2000-148, 2000 WL 472840, at \*3.

Both parties presented experts to support their respective positions. *See* Fed. R. Evid. 702; *Crimi v. Commissioner*, T.C. Memo. 2013-51, at \*40 ("An expert witness may be allowed to testify in a proceeding before this Court when his or her scientific, technical, or other specialized knowledge might help us to understand the evidence or decide a fact in issue."). Although experts are helpful, we are not bound by any particular expert opinion. *Hunt & Sons, Inc. v. Commissioner*, T.C. Memo. 2002-65, 2002 WL 398703, at \*9. In addition, we are free to accept only a portion of an expert's opinion. *Estate of Jackson v. Commissioner*, T.C. Memo. 2021-48, at \*64; *see also Parker v. Commissioner*, 86 T.C. 547, 562 (1986). We focus our analysis on the degree to which an expert's opinions are supported by the evidence in the record. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Estate of Davis v. Commissioner*, 110 T.C. 530, 538 (1998).

With this framework in mind, we determine the credibility of witnesses, resolve evidentiary conflicts, and draw inferences from the voluminous record developed by the parties. *Keating*, T.C. Memo. 2024-2, at \*50.

## III.   *Taxation of Insurance*

We begin our discussion by briefly explaining the taxation and deductibility of microcaptive insurance payments. Insurance companies—other than life insurance companies—are generally taxed on their income in the same manner as other corporations. *See* §§ 11, 831(a). However, section 831(b) provides an alternative taxing structure for certain small insurance companies. During the tax years at issue, an

[*37] insurance company with net written premiums (or, if greater, direct written premiums) that did not exceed $1.2 million (or $2.2 million beginning in 2016) for the year could elect to be taxed under section 831(b). *See* § 831(b)(2). A microcaptive that makes a valid section 831(b) election is subject to tax only on its investment income.

Further, amounts paid for insurance are deductible under section 162(a) as ordinary and necessary expenses paid or incurred in connection with a trade or business. *See* Treas. Reg. § 1.162-1(a). Section 162(a) does not prohibit deductions for microcaptive insurance premiums. But an inherent requirement for a company to make a valid section 831(b) election is that it must transact in insurance. *See Avrahami*, 149 T.C. at 175–76. Likewise, the deductibility of insurance premiums depends on whether the premiums were truly payments for insurance. *Syzygy Ins. Co. v. Commissioner*, T.C. Memo. 2019-34, at *28. These rules are even more complicated when the insurer and the insureds are related. *Avrahami*, 149 T.C. at 176. Although insurance premiums may be deductible, amounts set aside in a loss reserve as a form of self-insurance are not. *See, e.g.*, *Caylor Land & Dev.*, T.C. Memo. 2021-30, at *31.

Thus, these cases hinge on whether the Patels' microcaptive insurance arrangement meets the definition of insurance. But neither the Code nor the regulations define "insurance." *Id.* Thus, we are guided by caselaw in determining whether a particular transaction constitutes insurance for federal income tax purposes. *See Helvering v. Le Gierse*, 312 U.S. 531, 539–40 (1941); *Estate of Chew v. Commissioner*, 148 F.2d 76, 78 (5th Cir. 1945), *aff'g* 3 T.C. 940 (1944); *Avrahami*, 149 T.C. at 177.

Courts have examined four criteria in deciding whether an arrangement constitutes insurance for federal income tax purposes: (1) the insurer distributes the risk among its policy holders; (2) the arrangement is insurance in the commonly accepted sense; (3) the arrangement shifts the risk of loss to the insurer; and (4) the arrangement involves insurable risks. *Helvering v. Le Gierse*, 312 U.S. at 539–40; *Avrahami*, 149 T.C. at 177 (first citing *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1, 13 (2014); then citing *R.V.I. Guar. Co. & Subs. v. Commissioner*, 145 T.C. 209, 225 (2015); then citing *Harper Grp.*, 96 T.C. at 58; and then citing *AMERCO & Subs. v. Commissioner*, 96 T.C. 18, 38 (1991), *aff'd*, 979 F.2d 162 (9th Cir. 1992)).

"These four nonexclusive criteria establish a framework for determining the existence of insurance for Federal income tax

**[\*38]** purposes." *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*33. We will first look at risk distribution.

### A. *Risk Distribution*

Risk distribution is one of the common characteristics of insurance identified by the Supreme Court. *See Helvering v. Le Gierse*, 312 U.S. at 539. It occurs when the insurer pools a large enough collection of unrelated risks. *Rent-A-Center*, 142 T.C. at 24; *see also Caylor Land & Dev.*, T.C. Memo. 2021-30, at \*33. This concept is based on the law of large numbers—"a statistical concept that theorizes that the average of a large number of independent losses will be close to the expected loss." *Avrahami*, 149 T.C. at 181. "By assuming numerous relatively small, independent risks that occur randomly over time, the insurer smoothes out losses to match more closely its receipt of premiums." *Clougherty Packing Co. v. Commissioner*, 811 F.2d 1297, 1300 (9th Cir. 1987), *aff'g* 84 T.C. 948 (1985).

In prior captive insurance cases, taxpayers have attempted to show risk distribution in two ways: (1) participating in a pooling arrangement whereby the pool performs the functions[18] of an insurance company; or (2) issuing direct written policies to affiliate entities with a large enough pool of unrelated risks. *Swift*, T.C. Memo. 2024-13, at \*29. On both points, Magellan and Plymouth fail to demonstrate risk distribution.

### 1. *The Pooling Arrangement*

To decide whether Magellan and Plymouth distributed risk by participating in a captive insurance pool, we must determine whether Capstone performed the functions of an insurance company. *See Avrahami*, 149 T.C. at 185 (citing *Rent-A-Center, Inc.*, 142 T.C. at 10).

---

[18] As noted by respondent, our prior opinions have examined reinsurance pooling arrangements by determining whether the arrangement operated as a bona fide insurance company. *Avrahami*, 149 T.C. at 192; *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*29–30; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*38. The U.S. Court of Appeals for the Tenth Circuit's opinion affirming *Reserve Mechanical* noted that this Court did not invalidate a quota share arrangement on the ground that it failed to meet the formal definition of an insurance company. *Rsrv. Mech. Corp. v. Commissioner*, 34 F.4th at 912. Rather, this Court invalidated the quota share arrangement on the ground that, as a matter of substance, the pooling arrangement did not perform the *functions* of an insurance company. *Id.* Regardless of the label, our analysis focuses on whether Capstone performed the *functions* of an insurance company.

[*39] To determine whether an entity is performing the functions of an insurance company, we have considered a number of factors, including:

(1) whether it was created for legitimate nontax reasons;

(2) whether there was a circular flow of funds;

(3) whether the entity faced actual and insurable risk;

(4) whether the policies were arm's-length contracts;

(5) whether the entity charged actuarially determined premiums;

(6) whether comparable coverage was more expensive or even available;

(7) whether it was subject to regulatory control and met minimum statutory requirements;

(8) whether it was adequately capitalized; and

(9) whether it paid claims from a separately maintained account.

*Id.* at 185; *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *29–30. We will address the most relevant factors in our analysis. *See Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *38–39.

a.      *Circular Flow of Funds*

Under the arrangement with Capstone, each pool member paid 51 percent of its written premiums to Capstone in exchange for purported reinsurance. But within a few days, Capstone returned half the reinsurance premium to each pool member. Capstone returned another 35 percent within 7 or 8 months. For the tax years at issue, Magellan and Plymouth received payments from Capstone that were roughly equal to the premiums Capstone was entitled to receive from Magellan and Plymouth as part of the reinsurance agreement.

Further, although some claims were paid in the pool during the tax years at issue, the amounts were minimal, resulting in Magellan and Plymouth receiving nearly all of their premiums back as reinsurance premiums during the tax years at issue. In considering similar circumstances, we have determined that "[w]hile not quite a complete loop, this arrangement looks suspiciously like a circular flow of funds." *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *30–31 (quoting *Avrahami*, 149

**[\*40]** T.C. at 186); *see also Swift*, T.C. Memo. 2024-13, at \*33; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*41.

### b. *Arm's-Length Contracts*

There is no evidence of any arm's-length negotiations in determining the premiums paid to Capstone. As noted above, there is no actuarial determination of the reasonableness of the 51 percent of premiums ceded to Capstone. Magellan's and Plymouth's captive arrangement's rate-on-line was 12 times higher than the premiums for the commercial policies. Dr. Patel accepted these amounts despite not attempting to determine whether commercial insurance policies would offer the same or similar coverage for less.

As noted by the Court when discussing the lack of arm's-length contracts for a similar reinsurance pool:

> It is fair to assume that a purchaser of insurance would want the most coverage for the lowest premiums. In an arm's-length negotiation, an insurance purchaser would want to negotiate lower premiums instead of higher premiums. Seemingly, the main advantage of paying higher premiums is to increase deductions.

*Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*33–34. Similarly here, the lack of negotiation regarding premium prices—and Dr. Patel's desire to pay higher premiums to maximize his deductions and the amount flowing through the captives—demonstrate a lack of arm's-length transactions.

Moreover, Dr. Patel entered the reinsurance pool with other members without performing due diligence regarding the other pool members, including their risks, industries, ability to fulfill quota share claims, or captive insurance policies. This lack of due diligence is indicative of a lack of arm's-length negotiations.

### c. *Actuarially Determined Premiums*

We also look at whether the entity charged actuarially determined premiums. *Avrahami*, 149 T.C. at 186. We have previously held that premiums were actuarially determined when the company relied upon an outside consultant's "'reliable and professionally produced and competent actuarial studies' to set premiums." *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*34 (quoting *Rent-a-Center*, 142 T.C. at 27 (Buch, J., concurring)). In contrast, "[w]e have held that premiums were

[*41] not actuarially determined when there has been no evidence to support the calculation of premiums and when the purpose of premium pricing has been to fit squarely within the limits of section 831(b)." *Id.*

Here, Capstone charged its pool members a reinsurance premium of exactly 51 percent of their captive premium amounts, without accounting for the different risks of pool members, the types of businesses of pool members, or the geographical location of pool members. As in our prior cases, we are concerned with a one-size-fits-all approach to pricing. *See Avrahami*, 149 T.C. at 186–87; *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *36; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *43. As noted by Ms. Garland—whom we found credible—there is no evidence that the 51 percent of premium ceded to Capstone was actuarially determined. In contrast, Mr. Coomes's memorandum to captive owners implies that the amount was arbitrarily selected to comply with caselaw and a perceived safe harbor for risk distribution. Furthermore, although Mr. Coomes testified that an "actuary" determined premium amounts and the 51 percent reinsurance premium, we found that his testimony lacked credibility.

d.      *Approval by the TDCI*

Finally, the Patels argue that because the TDCI determined that Capstone is a reinsurer, the Court should show deference to that state regulatory agency. We disagree. Although the TDCI regulates insurance companies, it does not have the authority to determine whether an entity operates as an insurance company within the meaning of the Code. *See, e.g., Grp. Life & Health Ins. Co. v. United States*, 434 F.2d 115, 120 (5th Cir. 1970); *Cuesta Title Guar. Co. v. Commissioner*, 71 T.C. 278, 285 (1978), *aff'd*, 639 F.2d 787 (9th Cir. 1981) (unpublished table decision). We recognize that Congress has delegated to the states the authority to regulate the business of insurance. *See AMERCO & Subs.*, 96 T.C. at 42. But our focus is on whether Capstone was operated as an insurance—or reinsurance—company for federal tax purposes, looking beyond the formalities and considering the realities of the transactions. *See Syzygy Ins. Co.*, T.C. Memo. 2019-34, at *38. Here, although Capstone was organized and regulated as a reinsurance company under

**[\*42]** state and international law,[19] these insurance-like traits cannot overcome its other failings. *See id.*

### e. *Conclusion*

Based on the foregoing, we find that the facts surrounding the Capstone pooling agreement indicate that Capstone did not perform the functions of an insurance company.[20] *See Rsrv. Mech. Corp. v. Commissioner*, 34 F.4th at 912. Accordingly, Magellan and Plymouth have not achieved sufficient risk distribution via the Capstone pooling arrangement.

### 2. *Direct Written Policies*

Sufficient risk distribution may also be achieved by issuing policies to the Patels' affiliated entities. *See Avrahami*, 149 T.C. at 182. As noted by Ms. Garland, risk distribution "is achieved by insuring risks that are spread out and independent of each other, either by geographical region, type of exposure, line of business, or other criteria." The Patels' expert, Mr. Angelina, agrees that with the law of large numbers, the goal is to get an exposure base of statistically independent risks.

In *Rent-A-Center*, 142 T.C. at 24, we concluded that the captive assumed and pooled premiums for "a sufficient number of statistically independent risks" and achieved risk distribution because it issued policies for its affiliates that covered more than 14,000 employees, 7,100 vehicles, and 2,600 stores in all 50 states. We found that the captive in

---

[19] As set forth *supra* Findings of Fact Part III.B.2, Capstone was initially formed under the laws of the Turks and Caicos Islands. However, the Patels do not argue that the Court should show deference to the Turks and Caicos regulators.

[20] The Patels urge the Court to find that Capstone mirrors the Green Island Insurance Treaty, a reinsurance pool that both parties' experts consider to be one of the best reinsurance pools for captive insurance. However, there are obvious, significant differences between Capstone and Green Island. In the Green Island pool, (1) premiums are tailored to establish rates based on an individual participant's unique risk profile and loss experience; (2) the pool members are very large publicly traded companies with many independent exposures; (3) there are financial standards for both the captive and the parent; (4) Green Island is managed by a worldwide firm, not the same individual who also formed the captives; (5) premiums are tailored and revised annually based on historical losses; and (6) a participants' committee vets each company that wants to join the pool and requires the approval of a supermajority of 75 percent of committee members for a new company to join the pool. The record reflects that Capstone does not have any of these characteristics.

[*43] *Securitas Holdings, Inc. & Subs. v. Commissioner*, T.C. Memo. 2014-225, at *26–27, distributed risk effectively, for a number of reasons, including that it provided worker's compensation coverage for more than 200,000 employees, automobile coverage for more than 2,200 vehicles, and other coverages for more than 25 separate entities.

By contrast, in *Avrahami*, 149 T.C. at 181, we found that the captive's issuance of seven types of direct policies covering exposures for four related entities was insufficient to distribute risk. In *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *35–36, we found that the captive's issuance of eleven and thirteen types of policies for three insureds was insufficient to achieve risk distribution. Similarly, in *Caylor Land & Dev.*, T.C. Memo. 2021-30, at *35, we found that having zero risks from an unrelated party, with all risks in the same geographic area, was insufficient for risk distribution. We determined that there was no risk distribution where the taxpayer's captive insured, at most, two to three entities with six to nine lines of coverage. *Swift*, T.C. Memo. 2024-13, at *29.

We reach the same conclusion here. Magellan and Plymouth issued policies to only three (or fewer) related entities during the tax years at issue. From 2013 through 2014, Magellan directly insured only two related entities—OST and ICR. In 2015, Magellan directly insured only three related entities—OST, ICR, and SCR. In 2016, Magellan insured two related entities: ICR and SCR, and Plymouth insured just one entity: OST. Thus, Magellan's and Plymouth's issuance of policies to, at most, one to three entities is insufficient to achieve risk distribution.

The Patels would have us focus on the number of patient visits and procedures at each entity, not the number of insured entities. They argue that there were between 27,442 and 34,443 patient visits and between 6,621 and 9,084 procedures, creating over 88,200 points of exposure for OST across multiple offices and surgical locations for one year. We disagree. As noted by Ms. Garland, the number of patient visits is not relevant to most of the coverages insured by Magellan and Plymouth. Rather, the number of visits or patients is an indicator of risk for Dr. Patel's professional liability and general liability policies—the commercial policies he maintained despite forming Magellan and Plymouth. Similarly, a larger number of employees would increase the workers compensation exposure and medical professional liability exposure. But, again, these are coverages Dr. Patel maintained through his commercial insurance coverage, not the microcaptives.

[*44] Moreover, as we found, the standard in the industry is to look at the number of doctors when evaluating risk, *see Swift*, T.C. Memo. 2024-13, at *30, and "using the doctor-patient interaction as the appropriate unit of measurement for risk exposure would be tantamount to treating as the correct unit of measurement for risk exposure in the automobile insurance context every time a car is put into gear," *id.* n.13. And we do not think the number of physicians at Dr. Patel's entities sufficient for risk distribution. *See id.* at *30. At most, the entities had five physicians. We do not believe that this is an adequate number of risk exposures, concentrated in one line of insurance, for the operation of the law of large numbers. In short, the captives "face[d] a number of independent risks that are at least a couple orders of magnitude smaller than the captives in cases where we've found sufficient distribution of risk." *Caylor Land & Dev.*, T.C. Memo. 2021-30, at *37.

Regardless, when determining whether an arrangement distributes risk, we also analyze the number of *independent* risk exposures, *Avrahami*, 149 T.C. at 183, and the Patels' captives did not face independent risks. As noted above, we found independent risks in *R.V.I.*, 145 T.C. at 228–29, when an insurance company issued 951 policies covering more than 750,000 vehicles, 2,000 real estate properties, and 1.3 million equipment assets in 7 different geographic regions. The captive in *Rent-A-Center*, 142 T.C. at 24, had sufficient independent risk exposures when it provided workers compensation, automobile, and general liability policies that covered more than 14,000 employees, 7,100 vehicles, and 2,600 stores in all 50 states. Independent risk exposure was achieved in *Securitas Holdings*, T.C. Memo. 2014-225, at *26–27, when the captive provided workers compensation coverage for more than 200,000 employees, automobile coverage for approximately 2,200 vehicles, and other coverages for more than 25 separate entities.

In considering whether Magellan's and Plymouth's risk exposures were independent, we find that they fall well short of the situations described above. Magellan and Plymouth issued 22 to 36 policies to 3 health care entities owned by Dr. Patel during the tax years at issue. The insureds were all OST, ICR, and SCR: medical entities in the same geographic area of West Texas with fewer than 100 employees and 5 surgeons, some of which overlap, all operating in the same "well-defined slices of the medical field." *See Swift*, T.C. Memo. 2024-13, at *31. Thus, the lack of independent exposures is readily apparent and another reason the captives failed to achieve risk distribution. *See id.*

**[\*45]**    3.    *Revenue Rulings*

Finally, the Patels claim that the IRS provides risk distribution "safe-harbors" via Revenue Ruling 2002-89, 2002-2 C.B. 984, and Revenue Ruling 2002-90, 2002-2 C.B. 985. The Commissioner is required to follow his revenue rulings, and we have treated revenue rulings as concessions by the Commissioner where those rulings are relevant to the disposition of a case. *Rauenhorst v. Commissioner*, 119 T.C. 157, 171–73 (2002). But for a taxpayer to rely on a revenue ruling, the facts of the taxpayer's transaction must be substantially the same as those in the ruling. *Barnes Grp., Inc. v. Commissioner*, T.C. Memo. 2013-109, at \*37–38, *aff'd*, 593 F. App'x 7 (2d Cir. 2014).

Both rulings addressed situations involving parties who "conduct[ed] themselves consistently with the standards applicable to an insurance arrangement between unrelated parties." Rev. Rul. 2002-89, 2002-2 C.B. at 984; *see also* Rev. Rul. 2002-90. However, the rulings do not have facts substantially similar to those present here.

For example, both revenue rulings require risk distribution. *See* Rev. Rul. 2002-89; Rev. Rul. 2002-90. For the reasons discussed *supra* Opinion Part III.A.1 and 2, we find that risk distribution is not present here. Further, in Revenue Ruling 2002-89, premiums were established via customary industry rating formulas, which also are not present here. *See supra* Opinion Part III.A.1.c, B.4. In Revenue Ruling 2002-90, the premiums were the result of arm's-length transactions, which also did not occur here. *See supra* Opinion Part III.A.1.b. Accordingly, the Patels cannot rely on the revenue rulings to deduct the purported premiums. *See Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*48.

4.    *Conclusion Regarding Risk Distribution*

We conclude that Magellan and Plymouth did not achieve risk distribution, either through Capstone or through its affiliated entities. Risk distribution is a necessary component of insurance, and its absence here leads us to conclude that Magellan's and Plymouth's transactions during the tax years at issue were not insurance transactions. *See Avrahami*, 149 T.C. at 190.

B.    *Insurance in the Commonly Accepted Sense*

The absence of risk distribution is enough for us to conclude that the Magellan and Plymouth transactions were not insurance transactions. *See Avrahami*, 149 T.C. at 190; *Swift*, T.C. Memo. 2024-13,

**[\*46]** at \*37. But as an alternative ground, we also look at whether the transactions constitute insurance in the commonly accepted sense. *Caylor Land & Dev.*, T.C. Memo. 2021-30, at \*39. In making this determination, we examine a number of factors, including:

> (1) whether the company was organized, operated, and regulated as an insurance company;
>
> (2) whether it was adequately capitalized;
>
> (3) whether the policies were valid and binding;
>
> (4) whether premiums were reasonable and the result of arm's-length transactions;
>
> (5) whether claims were paid;
>
> (6) whether policies covered typical insurance risks; and
>
> (7) whether there was a legitimate business reason for acquiring insurance from the captive.

*Avrahami*, 149 T.C. at 191; *see also Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*37. Below, we examine the most salient factors to our analysis.

1. *Organization, Operation, and Regulation*

First, we consider whether Magellan and Plymouth were organized, operated, and regulated as insurance companies. In considering whether Magellan and Plymouth operated as insurance companies, we "look beyond the formalities and consider the realities of the purported insurance transactions." *See Avrahami*, 149 T.C. at 192 (quoting *Hosp. Corp. of Am. v. Commissioner*, T.C. Memo. 1997-482, 1997 WL 663283, at \*24). There is no dispute that Magellan was incorporated and regulated as a captive insurance company in St. Kitts. Further, Plymouth was incorporated and regulated in Tennessee.

However, aside from these organizational formalities, the facts demonstrate that Magellan and Plymouth were not operated as insurance companies. *See Swift*, T.C. Memo. 2024-13, at \*37; *Keating*, T.C. Memo. 2024-2, at \*53. Magellan's and Plymouth's planning, incorporation, and operations during the tax years at issue were managed almost entirely by Capstone and Mr. Coomes. Magellan and Plymouth had no employees of their own that performed services.

**[\*47]** In the shadow of litigation, Dr. Patel paints a sympathetic and compelling story about the downfall of the West Texas Hospital. We believe Dr. Patel's testimony about the end of the West Texas Hospital and its impact on him and his family. But a close examination of the evidence does not support his testimony that his experience with West Texas Hospital was the reason he decided to form captive insurance companies. Simply put, we did not find Dr. Patel's testimony on this point to be credible.

Further, there is no credible evidence that Dr. Patel's conversations about forming a captive centered around preventing a future disaster. Indeed, Dr. Patel stated that he did not need advice about forming a captive. Rather, he knew he was ready to proceed after studying books about asset protection and "the secret to capturing . . . [a] piece of America's multi-billion dollar industry." This is particularly poignant given that Dr. Patel maintained all of his regular commercial insurance coverage, including malpractice insurance, during the tax years at issue.

Moreover, other than Dr. Patel's self-study and the Business Plan created for Magellan, there is no evidence that any feasibility study was conducted to determine whether a captive was necessary and, if so, what policies were required. There is also no evidence that due diligence was conducted to determine whether a *second* captive was necessary. Rather, it appears that a desire to take advantage of increased tax benefits came first, and the justification to form a second captive came second. Relatedly, there is no evidence that Dr. Patel performed any due diligence with respect to the reinsurance or quota share agreements that Magellan and Plymouth executed with Capstone. As we noted in *Swift*, T.C. Memo. 2024-13, at \*37, "[t]his omission would seem bizarre if these were actual insurance companies."

In reality, Capstone orchestrated Magellan's and Plymouth's activities so that they appeared to be engaged in the business of issuing insurance contracts. But the facts establish that they were not *operated* as insurance companies in the commonly accepted sense. *See Swift*, T.C. Memo. 2024-13, at \*39; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at \*53. This factor weighs against the Patels.

2. *Capitalization*

Next, we turn to capitalization. The parties agree that Magellan met the minimum capitalization requirements of St. Kitts, and

[*48] Plymouth met the minimum capitalization requirements of Tennessee. This is the same as adequate capitalization. *See Swift*, T.C. Memo. 2024-13, at *39; *Keating*, T.C. Memo. 2024-2, at *56. This factor favors the Patels.

### 3. *Valid and Binding Policies*

Next, we examine whether the policies were valid and binding. The caselaw is not entirely clear on what makes a policy "valid and binding." We have held that policies were valid and binding when "[e]ach insurance policy identified the insured, contained an effective period for the policy, specified what was covered by the policy, stated the premium amount, and was signed by an authorized representative of the company." *Securitas Holdings*, T.C. Memo. 2014-225, at *28. In *R.V.I.*, 145 T.C. at 231, we found that policies were valid and binding when the insured filed claims for covered losses and the captive insurance company paid them. We have also looked at factors beyond whether the policies are simply binding such as conflicting policy terms. *Avrahami*, 149 T.C. at 194.

Generally, Magellan's and Plymouth's direct written policies contained the necessary terms to make them valid and binding insurance contracts. Nonetheless, the Magellan and Plymouth policies also contain atypical provisions that are not common within the insurance industry. Examples include (1) claims-made provisions that are unfavorable to the insureds; (2) excess policy provisions despite high premiums that are indicative of primary policies; and (3) an inability to cancel the policies and receive refunds. *Swift*, T.C. Memo. 2024-13, at *39 (noting that the policies at issue contained "questionable draftsmanship, with several of the policies acting effectively as excess coverage masquerading as primary").

Given that evidence regarding the validity of Magellan's and Plymouth's policies is mixed, we conclude that this factor is neutral for the Patels. *See id.*; *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86, at *54–55.

### 4. *Reasonableness of Premiums*

Next, we examine whether Magellan's and Plymouth's premiums were reasonable and the result of arm's-length transactions. For the reasons noted *supra* Opinion Part III.A.1.b and c, we find that Magellan's and Plymouth's premiums were wholly unreasonable.

**[\*49]**  First, it is apparent that Dr. Patel targeted the monetary limit of section 831(b) by telling his advisers how much he wanted to pay to the captives. When Magellan premiums dropped as a result of a change in the commercial insurance market, he chose to add SCR as an insured to get the total of premiums closer to the $1.2 million target. "As a general matter, we have serious reservations about the reasonableness of premiums developed to hit a preordained target for tax purposes, as here." *Swift*, T.C. Memo. 2024-13, at \*40.

Second, we give very little weight to Mr. Rosenbach's premium calculations. The record establishes that Mr. Rosenbach's calculations were aimed at targeting total premiums as close as possible to $1.2 million. Mr. Rosenbach used ill-defined factors to increase the premium amounts to reach the $1.2 million limit. He was aware of the $1.2 million limit and never priced premiums above that amount.

Relatedly, during the tax years at issue, the average rate-on-line for the Patels' captives' policies was up to 12 times higher than the rate-on-line for the Patels' commercial coverages. *See Keating*, T.C. Memo. 2024-2, at \*61 (finding a rate-on-line that was ten times higher than commercial insurance policies "patently unreasonable"). A higher rate-on-line means the insurance coverage is more expensive per dollar of coverage, thus leading to a greater deduction for premiums. *See Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*31–34. For example, Mr. Rosenbach priced premiums for the legal expense policy at $14,000 for $20,000 of coverage. As noted by Ms. Garland, this would be the equivalent of purchasing collision coverage for a $20,000 car and paying a $14,000 premium for that policy. This is further evidence that the premiums were unreasonable.

We also give little credit to Mr. Rosenbach's expert reports, which were prepared for the purpose of litigation and appear aimed at providing justification for the high premiums. This Court has already determined that Mr. Rosenbach's calculations under very similar circumstances were utterly unreasonable. *See Avrahami*, 149 T.C. at 194–95; *Swift*, T.C. Memo. 2024-13, at \*42–43. Mr. Rosenbach admitted that he was later sued for his premium calculations in *Avrahami*. Mr. Rosenbach's bias weighs against his credibility. *See Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1174 (5th Cir.), *opinion corrected*, 645 F.2d 511 (5th Cir. 1981) (observing that an expert's "potential bias may be explored on cross-examination"); *Nagle v. Gusman*, No. 12-cv-1910, 2016 WL 9411379, at \*1 (E.D. La. Mar. 3, 2016) (finding that evidence regarding an expert's "experience in a prior

**[\*50]** lawsuit is relevant to his potential bias and credibility as an expert witness" in current lawsuit); *Butler v. Rigsby*, No. 96-cv-2453, 1998 WL 164857, at \*3 (E.D. La. Apr. 7, 1998) ("[A]n expert witness' experiences in prior lawsuits is relevant to demonstrate possible biases."). We give Mr. Rosenbach's testimony little weight.

Finally, we once again note that Mr. Coomes could not recall whether he ever told Mr. Rosenbach to increase or decrease a premium amount. We found Mr. Coomes's testimony on this point to lack credibility, particularly in light of Magellan's and Plymouth's high premiums that were closely related to Dr. Patel's requested amounts. We conclude that Mr. Rosenbach's calculations were aimed not at actuarially sound decision-making but at justifying total premiums as close as possible to $1.2 (or $2.2) million, without going over, to satisfy section 831(b). *See, e.g.*, *Avrahami*, 149 T.C. at 196.

In short, we find that Magellan's and Plymouth's premiums were unreasonable and aimed at maximizing tax deductions, not at incorporating actuarily sound principles. "The voluminous record before us leaves the firm impression that premium amounts were engineered to suit the tax needs of the moment, not to account for any risk." *Swift*, T.C. Memo. 2024-13, at \*40. This factor weighs heavily against the Patels.

5.      *Payment of Claims*

Finally, we look at whether Magellan and Plymouth paid any claims. No claims were filed under Magellan's or Plymouth's direct written policies during the tax years at issue. As noted above, the majority of Capstone claims were submitted after the IRS began examining the Capstone captives. Magellan paid only $138,205 during the same period for its share of claims from Capstone. During that same period, Magellan collected millions in premiums.

Further, although we have received into evidence the Fourth Stipulation and accompanying exhibits, we find that this evidence is only marginally helpful in deciding the issues before the Court for the tax years at issue. As noted by respondent, changes were made to the Capstone pooling arrangement after the IRS began examining the captives formed by Mr. Coomes. Thus, subsequent claims activity— made after changes to Capstone—has little bearing on our analysis of the outcome here.

**[\*51]** In short, the relatively small payments made by Dr. Patel's captives might weigh slightly in favor of the Patels. But "we do not regard this as overwhelming evidence that the arrangement constituted insurance in the commonly accepted sense." *Syzygy Ins. Co.*, T.C. Memo. 2019-34, at \*45; *see also Swift*, T.C. Memo. 2024-13, at \*44.

### 6. *Conclusion Regarding Insurance in the Commonly Accepted Sense*

Although the Patels' captives displayed some attributes of insurance companies, the Patels have not proven that the payments that they seek to deduct as insurance expenses were for insurance in the commonly accepted sense. *See Keating*, T.C. Memo. 2024-2, at \*53. The Patels have therefore failed to prove that the payments were for insurance for federal income tax purposes.[21]

### C. *Conclusion Regarding Magellan and Plymouth Transactions*

Because we find that Magellan and Plymouth failed to distribute risk and were not selling insurance in the commonly accepted sense, we need not decide whether their transactions involved insurance risk or risk shifting. *Caylor Land & Dev.*, T.C. Memo. 2021-30, at \*48 (citing *Clougherty*, 811 F.2d at 1300 n.5). The premiums paid to Magellan and Plymouth and deducted by the Patels did not constitute "insurance" for federal tax purposes. *Id.* at \*48–49. Accordingly, we find that Magellan's and Plymouth's purported captive transactions did not constitute insurance because they failed to distribute risk and, in the alternative, did not act as an insurer commonly would.

### IV. *Effect on Petitioners*

Next, we examine the effect of these conclusions on the Patels. After initial briefing, the Court ordered additional briefing on the tax consequences if the transactions at issue are not insurance. *See* Docket No. 24344-17, Order (Doc. 359). In response, the Patels assert that, if

---

[21] In reaching our conclusions, we have considered that although states have the power to regulate insurance companies, states do not have the authority to determine whether payments made to purported insurance companies are for "insurance" within the meaning of the Code and for federal income tax purposes. *See, e.g.*, *AMERCO & Subs.*, 96 T.C. at 42. Accordingly, the Patels' repeated argument that the Court must defer to state agencies to determine whether the transactions are "insurance" is without merit.

[*52] the transactions are not insurance, then they should be considered indemnity contracts and analyzed as such. We have considered this argument and find no evidence in the voluminous record to support the Patels' new argument.

As noted by respondent, Magellan and Plymouth are not parties to this action, and therefore the tax consequences for those entities are beyond the scope of this Memorandum Opinion. Accordingly, we need not examine the consequences to Magellan and Plymouth.

But having determined that the Magellan and Plymouth arrangements did not constitute insurance, we will now discuss the legal effect of that conclusion on the Patels for the tax years at issue. Because the payments at issue were not for insurance, "then they are not ordinary and necessary business expenses" paid or incurred in connection with a trade or business and may not be deducted under section 162(a). *See Swift*, T.C. Memo. 2024-13, at *44–45 (quoting *Avrahami*, 149 T.C. at 199). We therefore sustain the Commissioner's determination to adjust the Patels' income by disallowing these deductions.

V.      *Conclusion*

Based on the foregoing, we sustain the Commissioner's deficiency determinations as set forth herein. In reaching our conclusions, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*An appropriate order will be issued.*